GAIL BORDEN *vs.* EDWARD DANIEL HUMM, JR., & another[1];
NATASHA JOHNSON, third-party defendant.

No. 06-P-770.

Middlesex. January 5, 2007. - September 7, 2007.

Present: DUFFLY, ARMSTRONG, & GRAINGER, JJ.

*Trust,* Construction, Termination.

In an action arising from the sale of two lots of real estate by parents (sellers) to their adult child and her husband (buyers), in which a side agreement provided for one lot to be held by the buyers as resulting trustees for the sellers, the judge correctly construed the provisions of the side agreement as leaving the survivor (the father) with the power to terminate the resulting trust after his wife's death and to dispose of the lot as he wished (namely, by canceling the side agreement); therefore, at the time of the father's death, the buyers held the lot in their own right, not as resulting trustees, and had no duty to convey the lot to the father's estate. [105-107]

CIVIL ACTION commenced in the Superior Court Department on November 21, 2003.

The case was heard by *Catherine A. White,* J., on motions for summary judgment.

*Michael H. Riley* for Gail Borden & another.

*Kenneth L. Kimmell* for Edward Daniel Humm, Jr., & another.

ARMSTRONG, J. On August 5, 1987, Raymond and Gertrude Borden, husband and wife (together, the Bordens), entered into a purchase and sale agreement to sell two adjacent lots (lots 11 and 12) located at 776 East Street in Carlisle to their daughter and son-in-law, Beverly and Edward Daniel Humm, Jr. (together, the Humms). Lot 12 was improved with a house; lot 11 was a vacant hay field. On the same day, the Bordens, as sellers, and the Humms, as buyers, entered into a side agreement providing, in pertinent part:

---

[1]Beverly B. Humm.

"1. That although the Purchase and Sale Agreement dated August 5, 1987 . . . covers approximately 7 acres, the Buyers intend only to acquire title in their own right to what was lot 12 . . . containing 4.82 acres.

"2. The Buyers agree that the conveyance to them will also include Lot 11 containing 87,224 square feet and will hold title to said lot as resulting Trustees for the sellers, until such time as the sellers may desire to have the same conveyed to them or, in the event of the death of the survivor of the sellers, the buyers will convey said lot to the estate of the survivor so that the same will become an asset in said estate."

By deed dated November 5, 1987, the Bordens conveyed title to lots 11 and 12 to the Humms for $325,000. The deed made no mention of the side agreement.

On December 24, 1996, Gertrude[2] died, leaving her "entire estate, whether real, personal or mixed, however described and wherever located," to Raymond. In February, 1997, Raymond contacted the attorney who had prepared the side agreement, and indicated that he wished to eliminate his beneficial interest in lot 11 so that the Humms would own lot 11 free and clear. On February 16, 1997, Raymond and the Humms executed a termination agreement, prepared by counsel, which provided, in pertinent part:

"WHEREAS, on August 5, 1987, Raymond E. Borden and Gertrude M. Borden, as Sellers, conveyed Lots 10 [*sic*, 12] and 11 on East Street, Carlisle, to Beverly B. Humm and Edward Daniel Humm, Jr., and

"WHEREAS, at said time an agreement was made concerning Lot 11, under which the said Humms agreed to hold title to said Lot 11 as Trustees for Raymond E. Borden and Gertrude M. Borden, or the survivor of them, and

"WHEREAS, over the last 10 years the said Bordens have given to said Humms a one-tenth interest in the equity of said property, and

---

[2]We refer to individuals by their first names in the interest of clarity.

"WHEREAS now the said Humms own the entire equity in said property, it is hereby agreed as follows:

"That the agreement dated August 5, 1987 is hereby cancelled and terminated and said Raymond E. Borden, as survivor of Gertrude M. Borden, acknowledges that the title to said property is entirely free and clear in said Humms, in fee simple free of all trusts and that he has no interest in said property."[3]

In October, 1998, Raymond executed a will and a revocable trust. Under the will, he devised the residue of his estate, including all of his real property, to the trust, the beneficiaries of which are his daughter Gail Borden (thirty percent), his granddaughter Natasha Johnson (Gail's daughter) (twenty percent), his daughter Beverly Humm (thirty percent), and his granddaughter Jennifer Leigh Humm (the Humms' daughter) (twenty percent).

Raymond died in July, 2002, and his will named Gail and Beverly as coexecutors of his estate. The will was never probated, and no executor was ever formally appointed. Beverly nonetheless prepared a complete inventory of all trust property, which she provided to Gail, and they used the list as a basis to divide up the trust assets in accordance with its terms, completing the property division in May, 2003. At no time did Gail ever assert that she considered lot 11 to be part of Raymond's estate subject to division under the trust. Approximately three months later, however, through counsel, Gail demanded that the Humms convey lot 11 to Raymond's estate. The Humms refused, and Gail commenced this Superior Court action against the Humms for declaratory and injunctive relief in November, 2003. The Humms counterclaimed for declaratory relief and also brought a third-party complaint for declaratory relief against Gail's daughter, Natasha.

A Superior Court judge granted summary judgment to the Humms, ruling that the interest in lot 11 given to Raymond by the side agreement was akin to that of a life estate; that Raymond (upon Gertrude's death) was the sole beneficiary of the trust created by the side agreement; and that because lot 11 was to be

---

[3]It is suggested by the plaintiff that the last two "whereas" clauses were not factual, and that they were intended by the draftsman for tax avoidance.

conveyed to Raymond's estate upon his death, he and his estate were the same and the estate had no separate interest in the trust as a beneficiary. As such, a beneficiary of the trust (specifically, Gail) had no standing to bring this action on her own behalf. To the extent that Gail might be seen as bringing the action on behalf of the estate (as beneficiary of that estate), and assuming that the action was not barred by the statute of limitations, the judge ruled that the trust was terminated by Raymond on February 16, 1997, by his execution of the termination agreement. Gail and her daughter, the third-party defendant Natasha, have appealed.

Gail and Natasha argue that the judge erred in assuming that Raymond and the Humms had the power to terminate the trust agreement because, between them, they held all legal and beneficial interests in lot 11 (i.e., after the Humms' estate for the life of Raymond ended, no one else could take an interest except through Raymond). The judge's ruling, Gail and Natasha argue, is precisely contrary to the rule of *Sands* v. *Old Colony Trust Co.*, 195 Mass. 575, 580 (1907), in effect representing a modern day resurrection of the Rule in Shelley's Case and the Doctrine of Worthier Title to snuff out further interests of heirs and devisees plainly provided for by the grantors (or, in this case, settlors). See generally Loring, A Trustee's Handbook §§ 8.15.2-3 (Rounds ed. 2007).

Gail's and Natasha's argument hinges on a construction of the side agreement under which the Bordens' power to reclaim lot 11 expired with the death of the first to die of the Bordens. The side agreement, Gail and Natasha point out, speaks only of reclaiming lot 11 as a joint decision ("until such time as the sellers may desire to have [lot 11] conveyed to them"), and after Gertrude's death there could no longer be a joint decision. Whatever the Bordens' purpose was, Gail and Natasha argue, that was the legal effect of what the Bordens signed.

Still, bearing in mind that the " 'fundamental principle of [our] law' [is] that trust instruments [are to] be construed to 'ascertain the intention of the [settlors] from the whole instrument, attributing due weight to all its language . . . and to give effect to that intent unless some positive rule of law forbids,' " *Pierce* v. *Doyle*, 442 Mass. 1039, 1040 (2004), quoting from *Dana* v. *Gring*, 374

Mass. 109, 117 (1977), we cannot but wonder what purpose might have inspired such a restriction on the power to reclaim lot 11. Surely it would not have been to tie the hands of Gertrude or Raymond, as the survivor, in disposing of the lot, because the side agreement expressly contemplates that it may pass according to the survivor's will. Doubtless a frequent concern of elderly people wishing to pass assets on to their children while living is the fear of giving too much, and of not having enough assets left for their own needs during their own lives. The right to reclaim in that event could be a logical antidote against having given too generously; but if that was the motivation behind providing the power to reclaim, one would not expect the power to cease with the death of the first of the Bordens to die, possibly leaving the survivor in necessitous old age without the power to reach the assets theretofore subject to recapturing.

We turn again to the language of the side agreement. As stated *supra*, it has the Humms accepting the title to lot 11

> "as resulting Trustees for the [Bordens], until such time as the [Bordens] may desire to have the same conveyed to them or, in the event of the death of the survivor of the [Bordens], the [Humms] will convey said lot to the estate of the survivor so that the same will become an asset in said estate."

The language used by the draftsman is obviously unartful, but we note that it nowhere expressly provides that the power to reclaim lot 11 expire at the death of the first of the Bordens to die. The most that can be said is that the language does not address the question.

To the plaintiffs, the omission is by itself conclusive. They cite *Bongaards* v. *Miller*, 440 Mass. 10, 15 (2003), quoting from *Phelps* v. *State St. Trust Co.*, 330 Mass. 511, 512 (1953), where the late Justice Sosman states, "[t]he law of Massachusetts is plain that a valid trust, once created, cannot be revoked or altered except by the exercise of a reserved power to do so, which must be exercised in strict conformity to its terms." The power of the Bordens to reclaim lot 11 is, of course, the power to revoke referred to in *Bongaards*, *supra*, and *Phelps*, *supra*; but here the issue is not the existence of that power, but its extent.

The language of the side agreement must be read as whole. *Pierce* v. *Doyle*, 442 Mass. at 1040. We focus on the words that follow the language on which the plaintiffs rely:

> "or, in the event of the death of the survivor of the [Bordens], the Humms will convey said lot to the estate of the survivor . . . ."

The draftsman used the phrase, "in the event." "In the event" is the language of contingency. There is nothing contingent about Raymond's death. It was only a matter of time. The only relevant contingency affecting the Humms' duty to reconvey lot 11 at Raymond's death is whether the power to reclaim the lot was previously exercised. The fact that the contingency is mentioned in the draftsman's discussion of the period following the death of the first to die suggests that he had in mind that the power would persist until the death of the survivor. If, as Gail and Natasha argue, the power expired at Gertrude's death, we should have expected the clause to read:

> "until such time as the [Bordens] may desire to have the same conveyed to them or, *at* the death of the survivor of the [Bordens], the [Humms] will convey said lot to the estate . . ." (emphasis supplied).

To construe the clause in such a manner would represent a material alteration of the language the Bordens used.

The judge was, in our view, correct in construing the clause to leave Raymond with the power to terminate the "resulting trust" after Gertrude's death and to dispose of lot 11 as he wished. Since he had the power to do so, it is unimportant that he elected to do so by canceling the side agreement rather than by demanding the reconveyance of lot 11. At Raymond's death, the Humms held lot 11 in their own right, not as resulting trustees, and had no duty to convey the same to Raymond's estate.

*Judgment affirmed.*